# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **C. VICTOR MBAKPUO** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. RWT-13-2213 |
| | * | |
| **WELLS FARGO BANK, N.A.** | * | |
| | * | |
| Defendant. | * | |
| | * | |

## MEMORANDUM OPINION

Like many Americans, Plaintiff C. Victor Mbakpuo experienced financial difficulties while the country was in the throes of the Great Recession, which resulted in his defaulting on his mortgage loan. Also like many Americans, Mbakpuo lays the blame for his financial woes at the feet of his mortgage lender, Defendant Wells Fargo Bank, N.A., and sues it for $39 million in damages, as well as equitable relief in the form of reformation of his mortgage contract. While mortgage lenders may bear some, most, or all of the blame for many of the mortgages gone bad during the recent economic crisis, that is not the case here. In order to survive summary judgment, Mbakpuo needed to produce some evidence that would allow a reasonable jury to conclude that Defendant Wells Fargo violated his legal rights. Mbakpuo has produced pages of vitriolic rhetoric directed at the mortgage lending industry in general, and Wells Fargo in particular, but has produced no evidence that Wells Fargo violated any of his legal rights.

Accordingly, Wells Fargo's motion for summary judgment will be granted, Mbakpuo's will be denied, and judgment will be entered in favor of Wells Fargo.[1]

## BACKGROUND

### I.    Facts

On December 13, 1999, Plaintiff C. Victor Mbakpuo executed an adjustable rate note secured by a deed of trust (the note and deed of trust, collectively, the "Mortgage") to purchase a home in Bowie, Maryland, from World Savings Bank, F.S.B. ("World Savings"). ECF No. 2-1. The Mortgage provided that, beginning on January 31, 2000, and every other Monday thereafter, World Savings would adjust the interest rate of the Mortgage. *Id.* at 1. The adjustment was tied to the Golden West Index, a proprietary index which reflected the weighted average of the interest rates in effect on the last day of each month on the deposit accounts of the depositary subsidiaries of Golden West Financial Corporation, the holding company of World Savings. *Id.* at 2. The interest rate on the loan at each adjustment was determined by taking the Golden West Index rate and adding a 3.4 percentage point margin. *Id.* The maximum interest rate World Savings could charge Mbakpuo was 11.95%. *Id.* The Mortgage provided that, if the Golden West Index became unavailable, World Savings could choose another national, regional, or other index approved by World Savings' regulator as a substitute index. *Id.* The Mortgage required World Savings to give notice to Mbakpuo in the event of a substitution. *Id.*

In connection with Wachovia's acquisition of Golden West, the Golden West Index ceased to exist in 2007, and Wachovia's own proprietary index, the Wachovia COSI, was

---

[1] Mbakpuo argues that summary judgment cannot be granted where there are cross-motions for summary judgment. ECF No. 45-1 at 43.  In support of this extraordinary argument, Mbakpuo cites *Sparks State Bank v. Martin*, 568 A.2d 1140 (Ct. Spec. App. Md. 1990).  To the extent this state court case could govern a procedural question in federal court, it does not stand for such a broad proposition. *Martin* does not state a categorical rule that where there are cross-motions for summary judgment, a court may not grant any motion for summary judgment, because such a rule would be absurd.  Rather, *Martin* simply stands for the common sense proposition that if cross-motions for summary judgment reveal a genuine dispute of material fact, each should be denied. *Id.* at 1142-44.

substituted as the index used to determine Mbakpuo's rate.  ECF No. 39-3 at 4.    In 2009, Defendant Wells Fargo acquired Wachovia, and when the Wachovia COSI ceased to exist, the Wells Fargo COSI was substituted.  *Id.* at 5-6.  Wells Fargo submits evidence that it sent notice of each of these substitutions to Mbakpuo.  ECF No. 39-3 at 48; ECF No. 39-3 at 55-56. Mbakpuo claims never to have received the notices.  ECF No. 2 at 4.

Due to a series of misfortunes and financial difficulties, Mbakpuo defaulted on the Mortgage on February 19, 2008.  ECF No. 2-1 at 8.  Mbakpuo applied for multiple loan modifications from 2008-2013.  He was initially offered a loan modification, but rejected its terms.  ECF No. 39-4 at 30.  Thereafter, he continued to apply for modifications under the federal Home Affordable Modification Program ("HAMP"),[2] but Wells Fargo determined that he was ineligible each time.  Without rehashing the details of the back and forth between Mbakpuo and Wells Fargo over these applications, Wells Fargo at each turn explained in depth the reasoning for its determination that Mbakpuo was not eligible for a HAMP modification, and at each turn Mbakpuo disagreed vehemently with Wells Fargo's explanations.  ECF No. 2-1 at 8-80.  Based on the correspondence between Mbakpuo and Wells Fargo, it is apparent that he never believed any of the representations made by Wells Fargo regarding his eligibility for a HAMP modification.

The Mortgage required that Mbakpuo purchase and maintain hazard insurance on the home.  ECF No. 39-3 at 31-32.  It also gave Wells Fargo the right to take any steps necessary to protect its interest in the home.  *Id.* at 32.  In 2013, Mbakpuo realized that insurance had been placed on the property by Wells Fargo pursuant to this provision.  ECF No. 2 at 18-19. Mbakpuo made this realization several years after Wells Fargo had sent him multiple letters requesting that he provide proof of insurance and warning that if he did not, insurance would be

---

[2] HAMP was established pursuant to the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765.

purchased on his behalf.  ECF No. 52-2 at 24.  Upon making this discovery, Mbakpuo purchased his own insurance at a lower rate, at which time Wells Fargo cancelled the policy it had purchased.  *Id.* at 105.

## II.      Mbakpuo's Claims

On the basis of these facts, Mbakpuo has asserted 11 counts against Wells Fargo.  Counts I, II, III and IV are fraud claims; in Counts I and II, Mbakpuo claims that Wells Fargo fraudulently calculated his interest rate, and in Counts III and IV, Mbakpuo claims that Wells Fargo fraudulently denied his request for a HAMP modification by misrepresenting his income and expenses.  ECF No. 2 at 4-13.  Count V is a breach of contract claim, alleging that Wells Fargo failed to provide Mbakpuo with notice of the index used to calculate his interest rate.  *Id.* at 13-15.  Count VI alleges various statutory violations due to Wells Fargo's alleged failure to respond adequately to written requests regarding the servicing of his mortgage.  *Id.* at 15-16. Counts VII and VIII allege negligent hiring, training, and retention on Wells Fargo's part based on a myriad of failures by its employees to deal with Mbakpuo's demands.  *Id.* at 16-18. Count IX alleges "Forced Insurance/Dodd-Frank" and challenges Wells Fargo's placement of insurance on Mbakpuo's home.  *Id.* at 18-19.  Count X alleges "Negative Amortization/Dodd Frank," and claims that Wells Fargo "added the delinquencies and recapitalized at the balance at $344,742.16" in violation of the Dodd-Frank Act's proscription on negative amortization.  *Id.* at 19-21.  Count XI seeks reformation of the mortgage.  *Id.* at 21.

### III.   Procedural History

Mbakpuo filed the Complaint *pro se* in the Circuit Court for Prince George's County, Maryland.[3]  ECF No. 1.  Wells Fargo timely removed the case to this Court on July 30, 2013.  *Id.* Following discovery, the parties filed cross-motions for summary judgment.[4]  ECF Nos. 39 and 41.  Oppositions and replies have been filed, and the motions are now ripe for decision.

### STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Disputes of material fact are genuine if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In order to avoid summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.  While the court must view the evidence in the light most favorable to the nonmoving party, *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006), it must also "prevent factually unsupported claims and defenses from proceeding to trial," *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v.*

---

[3] Although proceeding *pro se*, Mbakpuo did graduate from law school and obtain a law license, although it does not appear that he is currently licensed to practice law in any court.  *See Office of Disciplinary Counsel v. Mbakpuo*, 781 N.E.2d 208 (Ohio 2002) (disbarring Mbakpuo from practice of law in Ohio); *In re Mbakpuo*, 829 A.2d 217 (D.C. 2003) (denying admission to D.C. Bar based on Mbakpuo's Ohio disbarment); *In re Mbakpuo*, Case No. 1:94-mc-00051 (D. Md. 1994), ECF No. 5 (disbarring Mbakpuo in this District).

[4] At the request of Wells Fargo, the Court extended the deadline for filing dispositive motions to await the resolution of a case presenting similar issues in the U.S. District Court for the Western District of Washington.  ECF Nos. 27, 37.

*Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

## ANALYSIS

### I.    Wells Fargo is Entitled to Summary Judgment on Mbakpuo's Fraud Claims

Counts I, II, III, and IV of Mbakpuo's Complaint contain allegations of fraud against Wells Fargo.   Specifically, Mbakpuo claims in Counts I and II that Wells Fargo committed common law fraud by miscalculating Mbakpuo's interest rate, in Count III that Wells Fargo committed common law fraud by refusing to grant him a HAMP loan modification, and in Count IV that Wells Fargo committed fraudulent misrepresentation under the Maryland Consumer Protection Act[5] (the "MCPA") by refusing to grant him a HAMP loan modification. In Maryland, to prevail on a common law fraud claim, a plaintiff must establish:

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R*, 639 A.2d 660, 668-69 (Md. 1994).   Similar to a common law fraud claim, to prevail on a fraudulent misrepresentation claim under the MCPA, a plaintiff must establish (1) an unfair or deceptive practice or misrepresentation that (2) is relied upon, and (3) causes an identifiable loss as a result of his or her reliance on the purported misrepresentations.   *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 531-32 (D. Md. 2011).   Mbakpuo

---

[5] Md. Code Ann. Com. Law §§ 13-101 *et seq.*

has failed to establish any facts that would allow a reasonable jury to conclude that Wells Fargo committed any fraud as alleged.[6]

### A. Wells Fargo did not Commit Fraud with Respect to Mbakpuo's Interest Rate

Mbakpuo claims, in Counts I and II, that Wells Fargo committed fraud with respect to the calculation of his interest rate.  He alleges that Wells Fargo did not use any index for a period of time, did not use an index approved by its regulator, "calculated the mortgage with a base interest rate significantly higher than that on the national or regional index, even above 2%," improperly used 8.13% as an interest rate without a downward adjustment when interest rates in general went down, and failed to notify him when it changed indices.  ECF No. 2 at 4-8.  At best, there is no evidentiary basis to support these allegations.  At worst, the allegations are confused nonsense on their face.

### i.        At all times there was an index in place approved by regulators

Mbakpuo alleges that at times Wells Fargo was calculating his interest rate using an index not approved by regulators.  ECF No. 2 at 4-5.  Although difficult to understand, this allegation appears to have two elements.  First, that there were times when Wells Fargo was not using *any* index at all.  ECF No. 45-1 at 18.  Second, that Wells Fargo had failed to gain its regulator's approval for its substitute indices.[7]  ECF No. 2 at 7.

---

[6] Mbakpuo spends much of his argument on the fraud claims attempting to establish that they are alleged with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).  This may well be true, and Wells Fargo has not contested as much.  Unfortunately for Mbakpuo, this is a wasted argument.  This case is at the summary judgment stage, not the motion to dismiss stage.  He must do more than show that he has drafted an adequate complaint, he must show that there are facts in the record sufficient to allow a reasonable jury to rule in his favor.  *See Anderson*, 477 U.S. at 256 (stating that a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").

[7] Mbakpuo also appears to allege that it was somehow fraudulent for Wells Fargo not to provide him with proof that its regulators had approved an alternate index.  ECF No. 2 at 7 ("Defendant Wells Fargo never produced any proof of approval by its primary regulator, as required by the loan contract.").  Mbakpuo does not point to any provision in the Mortgage that would require Wells Fargo to provide proof of regulatory approval of an index, beyond the simple notice that an alternate index was being substituted.  Nor does he explain how failure to provide such proof could have constituted fraud.

Wells Fargo produced evidence that regulators had approved its substitute indices. ECF No. 40 at 52, 107.  Mbakpuo has not produced any evidence to the contrary.  Mbakpuo has also not produced any evidence that there was a "gap" in the use of an index to calculate his interest rate, beyond his own idle, confused speculation.  Summary judgment cannot be defeated by speculation alone.[8]

### ii.    Wells Fargo properly calculated Mbakpuo's interest rate

Mbakpuo alleges that Wells Fargo improperly and fraudulently calculated his interest rate.  Again, these allegations are confused and difficult to follow, but the crux of them appears to be that Wells Fargo used an interest rate that was higher than any other prevailing interest rate. ECF No. 41 at 7-12.

These allegations only demonstrate Mbakpuo's own confusion about how adjustable rate mortgages work in general, and how his worked in particular.  Mbakpuo's adjustable rate mortgage, of course, did not entitle him to any particular interest rate.  Nor did it entitle him to have any particular index used to calculate his interest rate, at least once the Golden West Index ceased to exist.  Finally, it certainly did not entitle him to pay only the same interest that was being paid on deposit accounts, as Mbakpuo seems to imply.  ECF No. 41 at 8 (arguing that Wells Fargo improperly charged an interest rate above 2%).

As relates to the interest rate Wells Fargo charged Mbakpuo, Mbakpuo was only entitled (i) to have his rate calculated by reference to the Golden West Index up until the point that index was no longer available, at which point Wells Fargo had the option to substitute any national,

---

[8] For its part, Wells Fargo conclusively explains the "gap" in indices purportedly identified by Mbakpuo. ECF No. 51 at 5-7.  Mbakpuo's argument that there is a gap is based on his own confusion regarding the difference between the public announcement of a merger, the consummation of a merger, and the conversion of the subsidiary assets of a merger.  Each of the Golden West Index, Wachovia COSI, and Wells Fargo COSI, were calculated based on prevailing interest rates on the parent company's subsidiary deposit accounts.  After consummation of a particular merger, the preceding index did not cease to exist until the subsidiary deposit accounts were converted to accounts of the new parent company, notwithstanding that the merger had been publicly announced and consummated.  ECF No. 39-3 at 4-5; ECF No. 51 at 5-7.

regional, or regulator-approved index of its choice, (ii) to have the margin added to the index rate to determine his interest rate be no more than 3.4%, and (iii) to be charged no more than an interest rate of 11.95%. ECF No. 2-1 at 1-2.

There is no evidence that Wells Fargo violated any of these provisions. Most of Mbakpuo's complaints about the interest rate he was charged are sound and fury signifying nothing. Mbakpuo complains that the index that governed his loan produced a higher interest rate than alternate indices that could have been used. ECF No. 2 at 7 ("the interest margin on the adjustable rate mortgage index during 2007 through 2013 was below 2%, sometimes below .4%, but Defendant Wells Fargo used a higher margin than what obtained on the national or regional index to calculate Plaintiff's monthly and/or yearly mortgage."). This may be so, but it is not fraud. Rather, given the absence of evidence that any of the index rates were calculated in a fraudulent manner, it is exactly what Mbakpuo bargained for.

Mbakpuo also claims that his interest rate remained at 8.13%, even as interest rates fell. ECF No. 41 at 9 ("As the foregoing items of evidence show, 8.13% was used in calculating the alleged delinquent interest and was applied to defraud, and did defraud, Plaintiff"). This is plainly contradicted from evidence in the record that Mbakpuo himself submits.[9] ECF No. 41-11 (showing that interest rate used to calculate interest due fell from 8.13% in February 2008 to 4.9% in August 2013).

### iii.    Wells Fargo provided adequate notice of the change in indices

Finally, with respect to Wells Fargo's actions regarding Mbakpuo's interest rate, there is no evidence in the record that Wells Fargo ever failed to provide notice to Mbakpuo when it

---

[9] Mbakpuo's argument here, like many of his other arguments, is at best confused, and at worst, a deliberate attempt to mislead the Court. For example, on the same page in which Mbakpuo claims Wells Fargo had been improperly using an 8.13% interest rate throughout the period of his default, ECF No. 41 at 9, he also argues that Wells Fargo improperly used a 5.54% interest rate during a portion of this time period. *Id.*

changed indices.   The Mortgage required Wells Fargo to give notice to Mbakpuo if it used a

substitute index.   ECF No. 2-1 at 2.   The Mortgage provided that notice to Mbakpuo was effected

by delivering it via first class mail to Mbakpuo at his home address.   ECF No. 2-1 at 4.   Wells

Fargo has presented evidence, in the form of business records as well as one of Mbakpuo's

statements, that it did mail notice to Mbakpuo of the index substitutions.   ECF No. 39-3 at 4, 48,

50, 55-56.

In the face of this evidence, Mbakpuo submits a sworn affidavit in which he asserts that

"I did not receive any notice in 2006, 2007, 2008, 2009, 2010, or at anytime whatsoever advising

[sic] me that Wells Fargo Bank, N.A., or its predecessors advising me of a change to an

alternative index."   ECF No. 45-4.   This may be so, and arguably creates a genuine dispute of

fact as to whether Mbakpuo did, indeed, receive the notice that was mailed to him.

Unfortunately for Mbakpuo, this dispute of fact is immaterial.   As noted above, the Mortgage

required only that Wells Fargo mail Mbakpuo the notice.   It did not obligate Wells Fargo to

ensure that Mbakpuo actually received the notice.   Whether Mbakpuo actually received the

notice is a matter between him and his postal carrier, not between him and Wells Fargo.

Moreover, even if it were the case that Wells Fargo had failed to notify Mbakpuo of its

substitution of indices, Mbakpuo does not connect the dots between that and the elements of

fraud.   For example, he fails to present any evidence that the failure to provide notice was a

"false representation" or that it was done to intentionally defraud him.   Also, Mbakpuo does not

show how a failure to notify caused him compensable damage.   Without a doubt, the Mortgage

gave Wells Fargo the right to use a substitute index of its choice in these circumstances.   It did

*not* give Mbakpuo the right to choose from multiple indices, so he could have sustained no

damage simply by failing to receive notice of a substitute index.   And although Wells Fargo

voluntarily gave Mbakpuo a choice between two of its proprietary indices, Mbakpuo does not submit any evidence that he would have been better off choosing the other index.[10]

Because Mbakpuo has failed to produce evidence sufficient to allow a reasonable jury to determine that Wells Fargo committed fraud in any way with respect to his interest rate, Wells Fargo is entitled to summary judgment on Counts I and II.

### B. Wells Fargo Did Not Commit Fraud With Respect to Mbakpuo's Requests for Modification

Mbakpuo claims, in Counts III and IV, that Wells Fargo fraudulently denied his frequent requests for a HAMP loan modification. The factual predicate for these claims is that various financial figures Wells Fargo used to determine Mbakpuo's eligibility for the HAMP program were inaccurate, and that this inaccuracy was intentional so as to ensure that he would not qualify. ECF No. 2 at 7-13.

As evidence that Wells Fargo fraudulently determined Mbakpuo was ineligible for the HAMP program, he has provided only the correspondence from Wells Fargo to him, in which Wells Fargo explains its determination that he is ineligible for a HAMP modification, and his bombastic responses in which he insists that he is eligible and accuses Wells Fargo of fraud. *E.g.* ECF No. 41-17 (Wells Fargo determination of ineligibility for HAMP), ECF No. 41-18 (Mbakpuo's response). Mbakpuo apparently believes that simply producing this correspondence, which includes his claims that the figures used are false, is enough to defeat summary judgment or, bafflingly, to entitle him to summary judgment. ECF No. 48 at 9 ("Wells Fargo's letter of February 21, 2013, admitted that it used $11,016.55 instead of $4,211.25 as Plaintiff's gross

---

[10] Wells Fargo gave borrowers the choice of opting into an alternate index, which Mbakpuo references when he argues that that "notice of the substitution was critical because of the 'permanent reduction of their margin'" if he chose the alternate index offered by Wells Fargo." ECF No. 45-1 at 19. What Mbakpuo ignores is that it was because he did *not* opt into that alternate index, Wells Fargo reduced his margin permanently from 3.4% to 3.34%. ECF No. 39-3 at 50.

income…If Wells Fargo's letter admitting its fraud does not constitute a competent evidence, what else would?").

If Mbakpuo is trying to prove that Wells Fargo used certain figures in determining his eligibility for HAMP, he has succeeded.  After reviewing the record, the Court has no doubt what figures Wells Fargo used to determine Mbakpuo's eligibility for a HAMP modification, or how it arrived at its conclusions.   If, however, Mbakpuo is trying to prove that those figures were fraudulent, he has utterly failed to do so.  Not only has Mbakpuo submitted no evidence showing that Wells Fargo's figures were a misrepresentation or constituted an unfair or deceptive practice, he has not even submitted any evidence that the figures were inaccurate.   Where Mbakpuo claims Wells Fargo misrepresents his gross income, he provides no paystub, tax return, or other evidence to show what his correct gross income was.[11]   Where Mbakpuo claims Wells Fargo overstated the mortgage payment on one of his properties, he provides no statement showing what the actual mortgage payment was.   The only evidence in the record that Wells Fargo's figures were wrong is Mbakpuo's conclusory correspondence claiming they were wrong, which is no more than a "scintilla of evidence" and cannot defeat summary judgment.

---

[11] Mbakpuo's claims regarding Wells Fargo's representation of his income are hopelessly confused.  For example, he complains that Wells Fargo used his monthly gross income of $11,016.55 instead of his monthly net income to determine his eligibility for a modification.  ECF No. 2 at 9.  At the same time, he complains about the opposite: that Wells Fargo used his monthly net income to determine his eligibility, improperly included his mortgage payment in determining his monthly net income and determined his monthly net income (Mbakpuo erroneously uses the term "gross income" to describe the result when he subtracts expenses from his actual gross income) "to be $2,132.98 by deducting the gross monthly household expenses of $9,320.14…on the loan modification form from the total or gross monthly income of $11,661.25 ($11,661.25-9,320.14 = 2,132.98)."  *Id.* at 10.  First, the $2,132.98 figure does not represent Mbakpuo's net income, because 11,661.25 minus 9,320.14 equals 2,341.11, not 2,132.98.  $2,132.98 represents a different monthly gross income figure for Mbakpuo.   Apparently Mbakpuo is self-employed, and provided profit and loss statements covering two separate periods to Wells Fargo, which Wells Fargo used to derive monthly gross income figures.  ECF No. 43-5 at 3-7.  Second, HAMP required a lender to use monthly gross income, not monthly net income, to determine eligibility.   *See* Home Affordable Modification Program Supplemental Directive 09-01 at 11 (April 6, 2009) ("The borrower's total monthly debt ratio…is the ratio of the borrower's monthly gross expenses divided by the borrower's *monthly gross income*) (emphasis added).  Therefore, any claim that Wells Fargo improperly used monthly gross income fails as a matter of law.

Even if a scintilla of evidence *could* defeat summary judgment on its own, it fails to do so here because Wells Fargo conclusively demonstrates that its figures were, in fact, reasonably accurate.  For example, Mbakpuo claims that Wells Fargo overstated his mortgage payment on several rental properties.  ECF No. 41 at 15-16.  What Mbakpuo fails to recognize is that the mortgage payment figures included the entire monthly expenses paid into those properties. Mbakpuo argues that a property in Adelphi, MD, had only a $131 monthly mortgage payment, instead of a $582.17 payment as Wells Fargo claimed.  *Id.* at 16.  However, a document submitted by Mbakpuo to Wells Fargo in connection with his HAMP modification application shows monthly expenses for that property of: (1) $183.33 in principal and interest payments[12]; (2) $53.38 in taxes; and (3) $346 in condo fees.  ECF No. 43-3.  Those figures result in a total monthly payment of $582.71, only $0.54 more than what Mbakpuo claims was an incorrect figure,[13] but $451.71 more than what Mbakpuo claims is the "correct" figure.  In other words, it is Mbakpuo's figures that are wildly inaccurate, rather than the allegedly fraudulent figures Wells Fargo produced.

While Mbakpuo's correspondence disputing Wells Fargo's figures does not create a dispute of material fact as to whether Wells Fargo used accurate figures in determining Mbakpuo's HAMP eligibility, that correspondence does show beyond dispute that Mbakpuo did not rely on any statement by Wells Fargo regarding his ineligibility for a modification.  Mbakpuo did not believe anything Wells Fargo said, and disputed its conclusions at every turn.  Mbakpuo cannot have relied on that which he did not believe, and thus cannot have been defrauded.  *See Sav. Banks Ret. Sys. v. Clarke*, 265 A.2d 921, 925 (Md. 1970) (affirming dismissal of fraud claim

---

[12] Incidentally, this is more than the $171 Mbakpuo claims is his mortgage payment on that property.
[13] There does not appear to be any evidence that Wells Fargo actually ever used $582.17, instead of $582.71.

where purchasers did not believe representations of sellers, but instead hired lawyers to investigate those representations).

Finally, Mbakpuo has failed to show damages.  At most, any inaccuracy in Wells Fargo's figures affected his eligibility for a HAMP modification.  However, Mbakpuo has not submitted any evidence that would show that, even if his figures had been used, he would have qualified for a modification under the HAMP program.

Mbakpuo has not presented any evidence that Wells Fargo used inaccurate figures, much less intentionally misleading or deceptive figures, in calculating his eligibility for a HAMP modification.  He has produced conclusive evidence that he did *not* rely on Wells Fargo's statements regarding his HAMP applications.  And he has not shown any damages from Wells Fargo's allegedly wrongful conduct.  Mbakpuo has not produced evidence of fraud, and therefore Wells Fargo is entitled to summary judgment on Counts III and IV.[14]

## II.   Wells Fargo is Entitled to Summary Judgment on Mbakpuo's Breach of Contract Claim

Mbakpuo's breach of contract claim is based on his allegation that Wells Fargo failed to send him notice of a substitute index, did not use an appropriate index, and did not send notice of regulator approval of any substitute index.  ECF No. 2 at 13-15.  For reasons already explained

---

[14] Mbakpuo relies heavily on *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) for the proposition that he can sustain his state law claims due to Wells Fargo's denial of a HAMP modification.  ECF No. 41 at 12-17. *Wigod* provides no support to Mbakpuo.  In *Wigod*, the plaintiff alleged that the lender promised her a HAMP modification if she met certain criteria during a trial modification period, and then failed to deliver on that promise despite the fact that she had met the relevant criteria.  *Wigod*, 673 F.3d at 557-59.  The lender moved to dismiss the complaint, arguing that there was no private cause of action for violations of the HAMP program.  *Id.* at 559.  The Seventh Circuit held that the plaintiff's state law claims for breach of contract, promissory estoppel, and fraud survived dismissal because, although HAMP contains no private cause of action, the plaintiff had stated those claims under state law based on the lender's promises or misrepresentations connected to its HAMP modification offer, and that those state law claims were not preempted by federal law.  *Id.* at 559.  *Wigod* is easily distinguishable, because Wells Fargo never offered or promised to offer Mbakpuo a HAMP modification.  Moreover, Mbakpuo's claim fails not because he lacks a private cause of action under HAMP, but rather because he lacks any evidence showing that Wells Fargo defrauded him or breached any contract.

in Sections I.A.i. and I.A.iii., *supra*, there is no evidence that any of Mbakpuo's allegations are true, and Wells Fargo is entitled to summary judgment on Count V.

### III.     Wells Fargo is Entitled to Summary Judgment on Mbakpuo's RESPA/Dodd-Frank Act Claim

Mbakpuo claims in Count VI that Wells Fargo violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, and § 1482 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. 11-203, 124 Stat. 1376.

As to RESPA, Mbakpuo claims that Wells Fargo failed to respond to his correspondence regarding the denial of his modification requests, each of which he asserts was a qualified written request ("QWR") as defined by RESPA, within the time frame required by RESPA.  The problem with Mbakpuo's argument is that none of the correspondence he points to was a QWR.

RESPA requires a servicer, upon receipt of a QWR from a borrower "for information relating to the servicing of such loan," to acknowledge receipt of the QWR within 5 business days, and to respond within 30 days.  12 U.S.C. § 2605(e)(1)-(2).  RESPA defines a QWR as written correspondence that enables the servicer to identify the account of the borrower, and that includes the reasons the borrower believes "that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  *Id*. § 2605(e)(1)(B). The statute further defines "servicing" as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts…and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."  *Id.* § 2605(i)(3).

Mbakpuo's RESPA claim fails because none of his letters concerned the servicing of the Mortgage.  Each was simply a contention that Wells Fargo improperly denied his request for a

HAMP modification.  *E.g.* ECF No. 2-1 at 65 ("I hereby dispute the decision on my loan modification application, for the following reasons.").  This does not relate to the servicing of a loan, as defined by RESPA.[15]  It is clear from the statute that the types of servicing inquiries it is directed at are those arising in the ordinary course of a borrower making, and a servicer applying, regularly scheduled mortgage payments.  *See* 12 U.S.C. 2605(i)(3) ("'servicing' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan").  Further, this provision of RESPA is primarily aimed at ensuring the prompt resolution of errors regarding payments and mortgage accounts, and ensuring that borrowers have access to sufficient information regarding their mortgage accounts.[16]  *Id.* § 2605(e)(1)(B)(ii) (defining QWR as written correspondence that "includes a statement of the reasons for the belief of the borrower…that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower"), § 2605(e)(2)(A)-(C) (requiring servicer to either "make appropriate corrections in the account of the borrower" or "provide the borrower with a written explanation…that includes…a statement of the reasons for which the servicer believes the account of the borrower is correct" or provides "the information requested by the borrower or an explanation of why the information requested is unavailable").

Mbakpuo's requests for a loan modification did not relate to the servicing of a loan because they did not relate to Wells Fargo "receiving any scheduled periodic payments from a

---

[15] Mbakpuo argues that it is a "voodoo theory" to frame the inquiry with reference to the definition of "servicing" instead of the definition of a QWR.  ECF No. 48 at 15.  This argument defies common sense.  12 U.S.C. § 2605 is titled "Servicing of mortgage loans and administration of escrow accounts."  Even more obviously, RESPA only requires servicers to respond to written requests "for information relating to the *servicing* of such a loan."  12 U.S.C. § 2605(e)(1)(A).  The meaning of this provision, by its plain language, is that written correspondence *must* relate to servicing as defined by RESPA if it is to be considered a QWR, and thus implicate the requirements of RESPA. *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 666 (9th Cir. 2012) (statutory requirement that QWR relate to servicing "ensures that the statutory duty to respond does not arise with respect to *all* inquiries or complaints from borrowers to servicers.") (emphasis in original).

[16] Mbakpuo argues that in a letter dated July 20, 2012, he challenged the principal amount Wells Fargo determined was due.  ECF No. 45-1 at 34; *see also* ECF No. 2-1 at 69.  However, to the extent this transforms the letter into a QWR regarding servicing, Wells Fargo responded to that specific contention by a letter dated July 24, 2012, well within the RESPA-imposed deadline.  *Id.* at 70-71.

borrower pursuant to the terms of a loan." *Id.* § 2605(i)(3). By definition, a loan modification is a request to *alter* the terms of a loan; a request for modification is a request to no longer make payments pursuant to the existing terms of a loan. Mbakpuo has cited no authority for the proposition that a request for a loan modification, or the approval or denial thereof, relates to the servicing of a loan, and in the face of the plain language of RESPA, the Court will not so hold here.

As to Mbakpuo's allegation that Wells Fargo violated § 1482 of the Dodd-Frank Act by failing to provide him with the information required by that provision when denying his application for a HAMP modification, there is no private cause of action for a violation of HAMP. *See Bowers v. Bank of America, N.A.*, 905 F. Supp. 2d 697, 701-02 (D. Md. 2012). Accordingly, even if Wells Fargo did fail to provide the information required by the Dodd-Frank Act in denying his HAMP application, Mbakpuo has no remedy. Accordingly, Wells Fargo is entitled to summary judgment on Count VI.

### IV.     Wells Fargo is Entitled to Summary Judgment on Mbakpuo's "Forced Insurance" Claim

Mbakpuo claims in Count IX that Wells Fargo improperly placed hazard insurance on his property. ECF No. 2 at 18-19. There is no dispute that Mbakpuo was required by contract to maintain hazard insurance on his property, and there is no dispute that Wells Fargo had the right to protect its interest in the property. ECF No. 39-3 at 31-32. Mbakpuo's argument that Wells Fargo's conduct was unlawful is based on his contention that he did have insurance on his home, and that Wells Fargo purchased insurance that was more expensive than what he eventually obtained. ECF No. 45-1 at 38 ("Count IX says that Wells Fargo for no reason went and replaced the existing policy with a very costly one that had a monthly premium of $374.61."). As to Mbakpuo's contention that he had hazard insurance, Mbakpuo produces no evidence that he

actually had a current insurance policy when Wells Fargo obtained it on his behalf.  Mbakpuo also does not point to any provision in the contract, or any provision of law, that required Wells Fargo to obtain insurance at the best possible rate if Mbakpuo breached his obligation to maintain insurance.

Mbakpuo cites § 1463 of the Dodd-Frank Act, codified at 12 U.S.C. § 2605, as standing for the proposition that Wells Fargo was prohibited "from force-placing this insurance on the Plaintiff."  ECF No. 45-1 at 40.  This is a blatant misrepresentation of the law.  The Dodd-Frank Act does not prohibit a lender from force-placing insurance.  Rather, it requires a lender to have a "reasonable basis to believe the borrower has failed to comply with the loan contract's requirement to maintain property insurance," and to send adequate notice to the borrower before force-placing insurance.  12 U.S.C. § 2605(k)-(l).  Wells Fargo has attached documentation showing that it communicated extensively with Mbakpuo regarding the insurance being purchased on his behalf.  ECF No. 52-2.  In any event, Wells Fargo placed that insurance before the Dodd-Frank Act was enacted.  *Id.* at 24.  Wells Fargo is entitled to summary judgment on Count IX.

### V.      Wells Fargo Did Not Create a "Negative Amortization" on Mbakpuo's Loan

Mbakpuo claims in Count X that Wells Fargo improperly "recapitalized" his loan by adding the delinquent interest, late fees, and other charges accrued as a result of Mbakpuo's default, back to his principal, causing a "negative amortization" in violation of the Dodd-Frank Act.  ECF No. 2 at 19-21.  This confused claim is without merit.

Mbakpuo does not appear to understand what negative amortization actually is. Negative amortization occurs when a borrower makes a regularly scheduled minimum payment on a loan and the principal balance of the loan increases.  *See* 12 C.F.R. § 1026.32(d)(2)

(defining negative amortization as a "payment schedule with regular periodic payments that cause the principal balance to increase"). Mbakpuo's principal balance did not increase because he made only the regularly scheduled minimum payment. Rather, the amount he owed increased because he stopped making any payments at all. That is not negative amortization. If it were, every loan could potentially be a negatively amortizing loan simply because, if the borrower stopped making payments, accrued unpaid interest and other charges would increase the total amount owed. There is no evidence that Mbakpuo has actually experienced a negative amortization on his mortgage. Fairly read, Mbakpuo's "negative amortization" claim has nothing to do with negative amortization, but is simply an argument that Wells Fargo should not have allowed his loan to continue to accrue interest and other charges when he defaulted. However, Mbakpuo cites no legal authority to this effect.

To the extent Mbakpuo is attempting to argue that any disclosure of the possibility of a negative amortization was inadequate under the provisions of the Dodd-Frank Act, this argument fails as well. The Dodd-Frank Act does not apply retroactively to the mortgage Mbakpuo entered into in 1999. *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 554n.2 (4th Cir. 2013). Wells Fargo is entitled to summary judgment on Count X.

### VI. Mbakpuo is not Entitled to Reformation

In Count XI Mbakpuo seeks the equitable remedy of reformation of the Mortgage. ECF No. 2 at 21. The grounds asserted in the Complaint for reformation are that "the interest rate index upon which the loan was underwritten no longer exists" and that the loan violates the Dodd-Frank Act. ECF No. 2 at 21. In his briefs, Mbakpuo provides additional grounds for reformation, including various hardships he suffered subsequent to signing the Mortgage, that "the toxic loan product Wells Fargo sold to Plaintiff and other borrowers caused the subprime

mortgage to implode, causing the worst housing crises [sic] in the history of America," that the loan is causing negative amortization, that Wells Fargo committed fraud, and that Mbakpuo did not have time to read the Truth in Lending Act disclosures.  ECF No. 41 at 25; ECF No. 45-1 at 42-43.

As a factual matter, many of the grounds Mbakpuo cites as supporting reformation have already been addressed in this Opinion and there is no evidence of them actually existing.[17]  As a legal matter, none of these grounds (with the exception of fraud, which has already been addressed) can support a claim for reformation.  Reformation is an equitable remedy that serves a narrow purpose and applies only in two cases: where a mutual mistake by the parties results in a written agreement that differs from their intent, or where through fraud or duress a written agreement differs from the intent of the innocent party.  *See, e.g., Jaguar Land Rover N. Am., LLC v. Manhattan Imp. Cars, Inc.*, 738 F. Supp. 2d 640, 650 (D. Md. 2010). Reformation is limited to those circumstances where it is necessary to capture the actual intent of a party whose intent, through no fault of their own, is not properly captured by the written agreement.

Reformation is not available simply to relieve a party of unforeseen hardships encountered subsequent to the formation of a contract.  *Id.* at 651 ("Reformation is not a vehicle for rewriting contracts to reflect changed circumstances since the time of contract formation."). Nor is it available simply because a party neglected to read the contract he signed.  *Cf. Julian v. Buonassissi*, 997 A.2d 104, 119n.15 (Md. 2010) ("Our jurisprudence is clear that when a competent person signs a contract…in the absence of fraud, misrepresentation, mistake, undue influence, or fiduciary relations, the contract will be enforced.").  Finally, it is not available simply because a party decides, after signing the contract, that it should be characterized as a

---

[17] *See supra* Section V (Negative Amortization), Section I (Fraud).

"toxic" contract.  Simply put, to be entitled to reformation, Mbakpuo must put forth some evidence that there was a mutual mistake, fraud, or duress.  He has put forth nothing.  Wells Fargo is entitled to summary judgment on Count XI.

### VII.    Wells Fargo is not Liable for Negligent Hiring, Training, and Supervision

Mbakpuo claims, in Counts VII and VIII, that Wells Fargo committed the torts of negligent hiring, training, and supervision.  ECF No. 2 at 18.  The bases for this claim are that Wells Fargo employees used incorrect figures in determining his eligibility for a loan modification, and did not respond adequately to his QWR's.  ECF No. 2 at 17-18.  Even assuming Wells Fargo owed Mbakpuo a duty giving rise to tort liability, which it did not,[18] Wells Fargo did not breach any such duty.  The Court has already explained elsewhere in this Opinion why none of the conduct Mbakpuo complains of in these counts was illegal or otherwise wrongful, and need not repeat itself.  *See supra*, Section I.B. (no evidence Wells Fargo used incorrect figures in determining modification eligibility), Section III (Mbakpuo did not submit any QWR implicating RESPA).  Wells Fargo is entitled to summary judgment on Counts VII and VIII.

---

[18] "It is pellucid that, in Maryland, the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and creditor."  *Yousef v. Trustbank Sav., F.S.B.*, 568 A.2d 1134, 1138 (Ct. Spec. App. Md. 1990).  Mbakpuo has presented no legal authority or factual evidence that would cause any other rule to apply.

**CONCLUSION**

For the foregoing reasons, Wells Fargo is entitled to summary judgment on all of Mbakpuo's claims.[19]   Judgment will be entered in favor of Wells Fargo.   A separate order follows.

<u>Date</u>:  July 20, 2015

/s/
ROGER W. TITUS
UNITED STATES DISTRICT JUDGE

---

[19] Mbakpuo also submitted a Motion for Settlement Conference.  ECF No. 33.  Because all of Mbakpuo's claims are being disposed of, this motion will be denied.